# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 1, 2025          Decided July 14, 2026

No. 24-5277

AXEL DIEGELMANN, ET AL.,
APPELLANTS

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF THE TREASURY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:24-cv-01090)

———

*Amir Toossi* argued the cause and filed the briefs for appellants.

*Sean R. Janda*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Yaakov M. Roth*, Acting Assistant Attorney General, and *Sharon Swingle* and *Benjamin M. Shultz*, Attorneys.

Before: KATSAS and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: This appeal involves economic sanctions imposed on foreign nationals for operating in the metals and mining sector of the Russian economy. It turns on whether buying finished precious metals, including gold bars, constitutes procuring geological materials within the meaning of the operative sanctions regime. On that interpretive question, we reject one of the challengers' arguments as meritless and another as unpreserved. We also uphold an administrative determination that the precious metals at issue were sufficiently connected to Russia.

I

The International Emergency Economic Powers Act authorizes the President to deal with an extraordinary foreign threat to the national security or foreign policy of the United States by declaring a national emergency with respect to the threat. 50 U.S.C. § 1701(a). If the President declares such an emergency, he may seek to address it by regulating the property of foreign nationals. *Id.* § 1702(a)(1)(B).

In 2021, President Biden invoked IEEPA to issue Executive Order 14024, which declares a national emergency with respect to various activities of the Russian Federation. Blocking Property with Respect to Specified Harmful Foreign Activities of the Government of the Russian Federation, 86 Fed. Reg. 20,249, 20,249 (Apr. 19, 2021). The Executive Order governs the property of any person determined by the Secretary of the Treasury to operate in Russia's technology sector, its defense sector, or "any other sector of the Russian Federation economy as may be determined by the Secretary." *Id.* at 20,249. The Order provides that such property is "blocked" and thus "may not be transferred, paid, exported, withdrawn, or otherwise dealt in." *Id.* The Order also blocks the property of any person or entity that is controlled by, or has

acted on behalf of, a person whose property is blocked by the Order. *Id.* at 20,250.

The Office of Foreign Assets Control (OFAC) implemented the Executive Order pursuant to its delegated authority. *See* 31 C.F.R. § 587.802. In 2023, OFAC extended the Executive Order to the "metals and mining sector of the Russian Federation economy." Publication of Russian Harmful Foreign Activities Sanctions Regulations Determination, 88 Fed. Reg. 16,887, 16,887 (Mar. 21, 2023). The Executive Order thus blocks the property of anyone who operates in that sector.

OFAC published guidance to clarify the scope of its sectoral determination. The guidance states that OFAC "anticipates publishing regulations" defining the "metals and mining sector of the Russian Federation economy" to include the following:

> any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation, or any act of procuring, processing, manufacturing, or refining such geological materials, or transporting them to, from, or within the Russian Federation.

OFAC, Russian Harmful Foreign Activities Sanctions, FAQ 1,115 (Feb. 24, 2023), https://perma.cc/JKD5-AGBU. By regulation, OFAC had previously applied this same standard to define the scope of the "metals and mining sector of the Russian Federation economy" for purposes of a different sanction that bars state-owned entities from operating in that sector. *See id.*; 31 C.F.R. §§ 589.201(a)(4)(v), 589.325.

4

II

Axel Diegelmann and his son Fritz are German nationals who trade in precious metals. In 2024, OFAC blocked property of the Diegelmanns and three companies owned by Axel. OFAC determined that Axel, Fritz, and one of Axel's companies operate in the metals and mining sector of the Russian economy, bringing them within the scope of the Executive Order and the OFAC sectoral determination. OFAC further determined that the other two companies are controlled by or act on behalf of Axel, also triggering the Executive Order. OFAC concluded that the Diegelmanns surreptitiously helped "Russia-based metals companies" to buy and sell precious metals, thus "circumventing international sanctions." J.A. 95.

The Diegelmanns sued to challenge the sanctions. OFAC defended them based on a public record and additional classified materials submitted for *in camera* review. The district court granted summary judgment to the government and denied summary judgment to the Diegelmanns. *Diegelmann v. Yellen*, No. 24-1090, 2024 WL 4880468 (D.D.C. Nov. 25, 2024).

III

We review the grant of summary judgment *de novo*, which means that we effectively review OFAC's sanction decision directly. *Rempfer v. Sharfstein*, 583 F.3d 860, 864–65 (D.C. Cir. 2009). Under the Administrative Procedure Act, we consider whether that decision was arbitrary or capricious. 5 U.S.C. § 706(2)(A). That standard is deferential to the agency—and "extremely deferential" for matters related to national security. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).

5

The Diegelmanns primarily raise interpretive questions regarding the scope of OFAC's sectoral determination. Sometimes, an agency's interpretation of its own regulations is entitled to deference. *See Kisor v. Wilkie*, 588 U.S. 558, 574–79 (2019). Because we conclude that OFAC acted within the scope of its delegated authority and agree with OFAC's interpretation of the governing regulation, at least as to the questions properly presented to us, we need not consider whether *Kisor* deference extends to the legal questions addressed below.

IV

The Diegelmanns admit that they bought precious metals, including finished gold bars, from Russian clients. They contend that, under OFAC's sectoral determination, this does not amount to operating within the "metals and mining sector of the Russian Federation economy." 88 Fed. Reg. at 16,887.

In construing that phrase, we may look to definitions of the same phrase in analogous statutory or regulatory schemes. *See*, *e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion); *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979). Here, 31 C.F.R. § 589.325 supplies a definition of the term "metals and mining sector of the Russian Federation economy" for purposes of another Russian sanctions regime. This regulation provides an obvious reference point for construing the sectoral determination under review. So, we agree with both parties that section 589.325 supplies the governing legal standard.

Section 589.325 defines operating in the "metals and mining sector of the Russian Federation economy" to include:

> any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation, or any act of procuring, processing, manufacturing, or refining such geological materials, or transporting them to, from, or within the Russian Federation.

31 C.F.R. § 589.325. OFAC contends that the Diegelmanns operate in the metals and mining sector of the Russian economy by "procuring" the "geological materials" of refined precious metals, including gold bars. The Diegelmanns respond that they did not *procure* anything at all and, alternatively, that the refined precious metals they acquired are not *geological materials*. The first objection is without merit, and the second is unpreserved.

First, the Diegelmanns contend that they have not engaged in any act of "procuring" within the meaning of section 589.325. Because the regulation does not define that term, we look to its ordinary meaning. *Zhang v. USCIS*, 978 F.3d 1314, 1319 (D.C. Cir. 2020). The verb *procure* means "[t]o get by special effort; obtain or acquire." *Procure*, Am. Heritage Dictionary, https://perma.cc/Q6NS-SURD. The regulation thus prohibits any act of getting by special effort, obtaining, or acquiring geological materials.

The Diegelmanns object that, in the mining industry, "procuring" means obtaining materials necessary to extract geological materials from the ground. For support, they cite materials stating the truism that "[p]rocurement in mining" means "acquiring the necessary goods and services for mining operations." Appellants' Br. at 26 (citation omitted). That merely confirms that "procuring" mining equipment means obtaining the equipment by special effort. It does not suggest

that the verb *procure* cannot take any direct object besides nouns referring to mining equipment. And it certainly does not suggest that the phrase "procure geological materials" somehow means "procure the equipment necessary to procure geological materials." We conclude that the phrase "procuring geological materials" incorporates the ordinary meaning of "procuring"—the phrase means acquiring geological materials through special effort.

Alternatively, the Diegelmanns focus on the phrase "geological materials." They contend that it refers only to materials in their natural state, not to metals that have been refined into finished products like gold bars. In their view, it is unnatural to refer to a refined gold bar as a "geological material." Moreover, they say, the regulation as a whole confirms this view: The phrase "extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials" refers to "geological materials" as raw materials extracted from the earth, as does the phrase "procuring, processing, manufacturing, or refining such geological materials." On this view, refined metals are the *result* of extraction, processing, manufacture, and refinement, but are not themselves the *object* of further such operations.

The Diegelmanns forfeited this argument by failing to present it to the district court. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984); *see, e.g., Abreu v. Howard Univ.*, 93 F.4th 498, 503 (D.C. Cir. 2024); *Keepseagle v. Perdue*, 856 F.3d 1039, 1053–54 (D.C. Cir. 2017). In their summary-judgment briefing, the Diegelmanns did not argue that the term "geological materials" encompasses only raw metals as opposed to processed ones. To the contrary, in support of their own motion for summary judgment, the

Diegelmanns faulted OFAC for failing to allege that they had "purchased any precious metals from inside of Russia." Pls.' Mot. for Summ. J. at 23, *Diegelmann v. Yellen*, No. 25-1090 (D.D.C. filed Aug. 28, 2024), ECF No. 15. Stressing the asserted lack of connection to Russia, the Diegelmanns practically invited the district court to assume that the regulation targeted "precious metals" writ large, not just unprocessed metals. Having done so, they can hardly fault the district court for deciding the case as they themselves had framed it. *See, e.g.*, *United States v. Wells*, 519 U.S. 482, 488 (1997); *Hudson v. AFGE*, 151 F.4th 456, 463 (D.C. Cir. 2025).

The Diegelmanns' responses are unpersuasive. First, they urge us to consider any arguments about the legality of the sanctions, including those not raised below, because we review summary judgments *de novo*. This point confuses standards of review with preservation requirements. Or to put the point somewhat differently, on *de novo* review, we hold that the district court properly declined to address an argument not presented to it, consistent with settled party-presentation principles. *See, e.g.*, *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam). Next, the Diegelmanns point to a sentence from their opposition to the government's motion for summary judgment. It states that the regulation "center[s] on the production of geological materials, not their sale." Reply Mem. in Supp. of Pls.' Mot. for Summ. J. & Resp. to Defs.' Cross-Mot. for Summ. J. at 6, *Diegelmann v. Yellen*, No. 24-1090 (D.D.C. filed Sept. 19, 2024), ECF No. 20. This distinction between production and sale does not hint at the presently asserted distinction between refined and unrefined materials. And in any event, the Diegelmanns offered this sentence in support of their distinct argument,

rejected above, that the term "procuring" can involve only the procurement of mining equipment.[*]

V

Finally, the Diegelmanns contend that OFAC lacked substantial evidence for the sanctions, largely because their activities were insufficiently connected to Russia. The Diegelmanns do not dispute that they bought precious metals from Russian nationals, but they suggest that a purchase is "to, from, or within the Russian Federation" within the meaning of 31 C.F.R. § 589.325 only if the metals at issue were both extracted from the ground within Russia and located in Russia at the time of the purchase. Even on those assumptions, the classified record adequately supports the OFAC sanctions.

*Affirmed.*

---

[*] Given the Diegelmanns' forfeiture, we have no occasion to consider whether the term "geological materials" encompasses refined precious metals such as finished gold bars. Likewise, we have no occasion to identify the precise moment in the production process (if any) when a metal extracted from the ground no longer qualifies as a "geological material."